SARAH G., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

No. S–14150.

Supreme Court of Alaska.

Dec. 2, 2011.

Olena Kalytiak Davis, Anchorage, for Appellant.

Joanne M. Grace, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

## OPINION

CARPENETI, Chief Justice.

## I.  INTRODUCTION

Four children were removed from their parents' care based on domestic abuse in the parents' relationship. The parents later divorced and the mother was able to regain custody, but thereafter she entered into another abusive relationship. Two of her sons physically intervened in one violent confrontation between the mother and her new partner and notified the police of the abuse. The State took the boys and their two younger siblings into temporary custody. Their mother appeals the superior court's finding that all four children were children in need of aid under AS 47.10.011(8), (10), and (11), and that the two eldest children were also in need of aid under AS 47.10.011(4) and (6). Because we conclude that continued exposure to domestic violence placed the children at substantial risk of injury, we affirm the superior court's finding that the children are children in need of aid.

## II.  FACTS AND PROCEEDINGS

Sarah is the biological mother of Wes (age 19), Marco (age 15), Dustin (age 11), and Skyla (age 9).[1] The children are Indian children under the Indian Child Welfare Act

---

1.  In order to protect the privacy of the parties,    we use pseudonyms.

(ICWA).[2] Their biological father, Wilson, was married to Sarah for eight years and in a relationship with her for over 15 years. Throughout the couple's relationship, Wilson abused Sarah and the children, and was convicted on several occasions of assaulting Sarah.[3] Sarah has bipolar disorder, which causes mood swings, and she can become violent towards Wilson if her disorder is not controlled by medication. She has been taking medication for her disorder since 2004. Wilson testified that Sarah has struggled with substance abuse, which brought out similarly violent behavior towards Wilson.

In October 2006, the Office of Children's Services (OCS) removed the children from Sarah and Wilson's care because the "ongoing pattern of physical assaults against [Sarah]" put the children at risk. The superior court granted OCS temporary custody, and in Spring 2007 found that the children were in need of aid under AS 47.10.011(8) and AS 47.10.011(9).[4]

In June 2009, the children were returned to Sarah's custody. Near that time, Sarah and Wilson divorced and Sarah obtained a restraining order against Wilson. At some point, Sarah began a relationship with Frank. After the children returned home, OCS received several reports of harm, all of them involving drinking.

Full OCS involvement resumed in February 2010, based on two reports. First, OCS received a report in which Dustin stated, "my mom's boyfriend always hits me, and he almost killed my mom." Later that same month, Alaska State Troopers went to Sarah's home in response to a 911 call from Wes reporting "big time domestic violence." That night, Sarah, Frank, Wes, and Marco were involved in a physical altercation during which Frank assaulted Sarah. Wes and Marco retaliated against Frank, and both Wes and Marco were injured. The boys tried to call 911, but Sarah knocked the phone out of their hands. Eventually Wes was able to call for help. The police arrested Sarah, Wes, and Marco.

OCS then filed an emergency petition for temporary custody. According to the petition, the children reported that they did not feel safe at home and that Frank had assaulted Sarah on multiple occasions. They also said that Frank often punched Marco and had choked him on multiple occasions. The children reported being spanked with belts by both Sarah and Frank, leaving bruises and marks. Sarah was bruised and discolored on much of her face, which she attributed to falling on a casserole dish after struggling with Marco, as well as falling down and hitting her cheek with her knee the previous week.

### A. The Children's Placements Following OCS Custody.

After OCS assumed custody, all of the children required extraordinary care. After release from the Mat–Su Youth Facility, Marco was placed in a foster home and Wes was placed at the Dorothy Saxton Youth Shelter. Wes ran away from the Youth Shelter and upon return to OCS custody was placed in the same foster home as Marco. Wes started substance abuse treatment and was doing "pretty well" in the foster home at the time of trial. Marco exhibited some "behavioral issues" at the foster home and was placed in Dorothy Saxton for a few days, but since then had become "pretty stable." OCS first placed Skyla in a foster home but she was admitted to North Star Hospital after she exhibited "out of control behavior." She was then moved to a therapeutic foster home where she had been fairly stable at the time of trial. Dustin was diagnosed with a variety of significant mental disorders and was admitted to North Star Hospital. He was then transferred to a residential facility in Fairbanks but after exhibiting aggressive and sometimes violent behavior he was readmitted to North Star Hospital.

**2.** 25 U.S.C. § 1903.

**3.** For a detailed history of the relationship between Sarah and Wilson see *Wilson W. v. State of Alaska, Office of Children's Servs.*, 185 P.3d 94, 96 (Alaska 2008).

**4.** *Id.* at 99. We affirmed the superior court's findings. *Id.* at 96.

## B. Superior Court Hearings.

On five separate days between June 4, 2010, and November 19, 2010, the superior court conducted hearings on whether the children were in need of aid.[5] The court heard testimony from OCS staff; Sarah; her ex-husband, Wilson; her eldest son, Wes; and expert testimony from the Director of Domestic Violence Programs at Alaska Family Services. At the conclusion of the hearings, the superior court found all four children were in need of aid under AS 47.10.011(8) (mental injury), (10) (substance abuse), and (11) (parent's mental illness). The superior court also found that Wes and Marco were in need of aid under subsections (4) (failure to provide treatment) and (6) (failure to supervise). Sarah appeals, arguing that her children are not children in need of aid under any subsection.

## III. STANDARD OF REVIEW

In a child in need of aid case we review the superior court's factual findings for clear error.[6] We will reverse only if left with "a definite and firm conviction that a mistake has been made."[7]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Adjudicating The Children As Children In Need Of Aid Under AS 47.10.011(8)(B)(ii).

Under AS 47.10.011(8)(B)(ii), the court may find a child to be a child in need of aid if it finds, by a preponderance of the evidence, that "conduct by or conditions created by the parent, guardian, or custodian have . . . placed the child at substantial risk of mental injury as a result of . . . exposure to conduct by a household member . . . against another household member that is a crime." The superior court found "by a preponderance of the evidence that [Sarah] has a continued tendency to enter into physically abusive relationships, creating a substantial risk of mental injury for her children." The superior court cited Sarah's own testimony that all four children suffer from post-traumatic stress disorder from her abusive relationship with the children's father, and expert testimony about the detrimental impact of witnessing domestic violence on children's brains. Though Sarah and Wes testified that domestic violence was not an issue in the home, the superior court found that this testimony was not credible based on evidence that both Sarah and the children had injuries indicating domestic violence.

Sarah disputes the superior court's findings on two grounds. First, she argues that no evidence supports the finding that she has a "continued tendency" to enter physically abusive relationships. While acknowledging that she followed her abusive marriage to Wilson with a "troubled relationship" with Frank, Sarah claims that this does not show a tendency toward entering abusive relationships. She argues that the superior court's holding compels the conclusion that any woman who fails to sever all contact with an abusive partner at the first sign of violence would show a "continued tendency" to enter abusive relationships.

The State counters that ample evidence supports the superior court's findings that Sarah was unwilling to admit that violence was an issue in her home, that the danger of domestic violence had not necessarily passed as Sarah has aggressive tendencies, and that Sarah's relationship with Frank supports a finding that Sarah has a "continued inability to notice and address developing domestic violence situations."

---

5. All parties have an interest in speedy resolution of CINA cases. That it took over five months to complete a five-day evidentiary hearing on adjudication is extremely troubling. Although multiple continuances were caused by scheduling conflicts and both Sarah's and Wilson's failure to personally attend trial on days they were scheduled to testify, both courts and practitioners must be vigilant in ensuring a speedy resolution of CINA cases because children's time-sensitive interests are at stake. CINA trial courts that experience frequent episodes of drawn-out adjudication and termination hearings must re-examine their scheduling practices.

6. *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 175 P.3d 1263, 1267 (Alaska 2008).

7. *Id.*

We are persuaded by the State's argument. Though Sarah claims that a succession of two bad relationships does not constitute a "continued tendency" toward abusive relationships, no evidence at trial supported a finding that Sarah has ever successfully had a non-violent relationship. Importantly, the children's entire lives have been lived in the shadow of their mother's abusive relationships. The record contains clear support for the superior court's finding that Sarah had a tendency to enter and remain in abusive relationships.

Second, Sarah argues that no evidence at trial showed that her relationships created a "substantial risk of mental injury" to her children. She claims that testimony about the detrimental impact of domestic violence on children's brains lacked specific facts about these children and was therefore not credible. Sarah argues that her relationship with Frank and recent domestic violence incidents are "moot" because the relationship is over and Frank has moved out of the state.[8]

The State counters that termination of a relationship does not render the issue moot— a trial court should look at the totality of the evidence when determining whether a child is in danger of harm. The State also argues that all the children are "particularly vulnerable to mental injury from exposure to domestic violence," as evidenced by their mental health issues and "continuing struggles in state custody."

We find the State's argument persuasive. First, Sarah's argument that her relationship with Frank is now moot has no merit. In the context of termination of parental rights proceedings, which first require a CINA finding, we have said that the court "may consider

... evidence of parental conduct predating the CINA adjudication."[9] The same reasoning applies here. Though Sarah tries to diminish the importance of her past, it does not become irrelevant simply because her relationships with Wilson and Frank are over.

Sarah's claim that there was no evidence that her relationships created a substantial risk of injury to her children also lacks merit. Domestic violence was clearly a problem in Sarah's home, featuring prominently in both her marriage to Wilson and her relationship with Frank. Her failure to acknowledge it magnifies the possibility of its recurrence. In the domestic violence context, we have held that the mere witnessing of domestic violence is damaging to children.[10] Because of this, we have found that domestic violence in the home, even if not committed against the children, poses a high risk of mental injury.[11] OCS presented extensive testimony on the emotional and mental effects of domestic violence on children. It is abundantly clear that domestic violence poses a significant risk to children who are present in the home.

Further, there was evidence not only that the children were at risk of harm, but that they had actually suffered harm. Sarah's own testimony indicated that the children suffered from PTSD and required intensive therapy. Testimony from OCS staff throughout the hearings highlighted the children's struggles in OCS custody, indicating the damage caused by their exposure to violence in the home.

Both Sarah's tendency to enter violent relationships and that those relationships cre-

---

**8.** As to Wilson, Sarah acknowledges that AS 47.10.011 permits the court to look at past conduct or conditions, but argues that her relationship with Wilson should not determine whether the children are in need of aid in the present.

**9.** *Danielle A. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 215 P.3d 349, 354–55 (Alaska 2009) (quoting *A.H. v. State, Dep't of Health & Soc. Servs.*, 10 P.3d 1156, 1161 (Alaska 2000)) (internal quotation marks omitted).

**10.** *See A.H.*, 10 P.3d at 1161–62 (citing *In re J.A.*, 962 P.2d 173, 178 (Alaska 1998)). ("[W]e have

recognized that because witnessing domestic violence has a 'devastating impact' on children, domestic violence need not be directed toward the child or signify a significant risk of physical harm to a child to support a CINA finding.").

**11.** *See, e.g., Winston J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 134 P.3d 343, 348 (Alaska 2006) (upholding a superior court finding that children were at substantial risk of mental injury from a father who committed domestic violence against their mother before they were born).

ate a risk of mental injury to her children are supported by the record. We affirm the superior court's findings on these grounds.

### B. Because We Affirm The Superior Court's Finding That The Children Were In Need Of Aid Under AS 47.10.011(8)(B)(ii) We Do Not Reach Sarah's Other Claims Of Error.

Sarah additionally challenges the superior court's determination that her children were children in need of aid under AS 47.10.011(10) and (11) and that Wes and Marco were in need of aid under subsections (4) and (6). Because only one statutory basis is required for a CINA finding, we do not need to address the superior court's other CINA findings.[12]

We note, however, that we are puzzled by the superior court's reference to "journal entries" used to support the court's finding that the children were in need of aid under AS 47.10.011(10). Our review of the exhibit does not lead to the same conclusion. First, the handwritten entries appear to be Sarah's letters defending her husband, Wilson, from an assault charge rather than journal entries. Second, the entries do not contain any indication of substance abuse; the only entry involving alcohol merely mentions going to a bar. Instead the letters detail the writer's struggle with mental illness, violent mood swings, and problems adjusting to and obtaining proper medication. A further review of the record indicates that 46 additional handwritten pages were offered but were ultimately withdrawn. We are concerned that the superior court may have relied upon evidence that was not admitted, or that the exhibits were misnumbered, indicating a problem maintaining a proper record for review. Nonetheless, testimony by Wilson was credited by the court and provided ample support for the superior court's finding that the children were in need of aid under AS 47.10.011(10) (substance abuse).

## V. CONCLUSION

Because the superior court did not err in finding that Sarah's extensive history of abu-

sive relationships was likely to result in harm to the children we AFFIRM the superior court's finding that Marco, Wes, Dustin, and Skyla are children in need of aid under AS 47.10.011(8)(B)(ii).

---

12. AS 47.10.011; *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 762 (Alaska 2009) (citing *G.C. v. State, Dep't*

of Health & Soc. Servs., Div. of Family & Youth Servs., 67 P.3d 648, 651 (Alaska 2003)).